570 So.2d 908 (1990)
Rigoberto SANCHEZ-VELASCO, Appellant,
v.
STATE of Florida, Appellee.
No. 73143.
Supreme Court of Florida.
October 11, 1990.
Rehearing Denied December 26, 1990.
*910 Barbara S. Levenson, Coral Gables, for appellant.
Robert A. Butterworth, Atty. Gen., and Giselle D. Lylen, Asst. Atty. Gen., Miami, for appellee.
PER CURIAM.
Rigoberto Sanchez-Velasco appeals his convictions for first-degree murder, sexual battery of a victim under twelve years old, and theft, and his resulting sentences of death, life in prison, and five years in prison, respectively. We have jurisdiction.[1] For the reasons expressed, we affirm the convictions and the sentences, including the sentence of death.
The relevant facts are as follows. Rigoberto Sanchez-Velasco resided with Marta Molina in Hialeah on December 12, 1986. When Ms. Molina went to work that afternoon, she left her eleven-year-old daughter, Katixia (Kathy) Encenarro, in the care of Sanchez-Velasco, with instructions that the child was to go to a neighbor's apartment later that evening. During the evening, Kathy spoke to Ms. Molina by telephone, as did Sanchez-Velasco, and Ms. Molina learned that Kathy had stayed in her own apartment. Ms. Molina had locked both deadbolt locks on her door when she left for work that day. When she arrived home, she found only one of the deadbolts locked. She had found out earlier that day that Sanchez-Velasco had made a duplicate set of her keys without her permission and that he was unable to lock one of the deadbolts with his duplicate key. Ms. Molina's apartment was very neat when she returned home late that evening, and there were no signs that it had been searched or ransacked. However, Sanchez-Velasco was not in the living room where he normally slept. When she went to Kathy's bedroom and pulled down her blanket, Ms. Molina found Kathy's dead body. Kathy's face was swollen, and she was naked and bleeding from her vagina. Missing from the apartment were Kathy's gold chains, her identification bracelet, and Ms. Molina's fur coat.
The medical examiner concluded that a T-shirt had been twisted around Kathy's neck and that scratches on her neck were consistent with neck chains having been caught up in the shirt. Also, the medical examiner determined that Kathy had been raped while she was alive and that strangulation was the cause of her death.
Hialeah police officers investigating the murder believed that Sanchez-Velasco was the last person to see Kathy alive, and they considered him to be either a suspect or a material witness. They contacted several of Sanchez-Velasco's friends, whose names had been provided by Ms. Molina. One of them, Gilberto Estrada, complained that Sanchez-Velasco had stolen his stereo, and he set up a meeting with Sanchez-Velasco in Miami Beach and informed the police of the meeting. The Hialeah police officers went to Miami Beach in an unmarked police car. They arrested Sanchez-Velasco for grand theft of the stereo, which they believed to be valued at over $300, and they placed him in handcuffs. The officers then learned from Estrada that he had receipts totaling only $180; thus, the value of the stereo was less than $300. They called the office of the state attorney and were advised that they had no grounds for a grand theft arrest. The officers testified that they then removed the handcuffs and Sanchez-Velasco walked off and sat on some nearby boards next to the street.
According to the officers' testimony at trial, the following events then occurred. Approximately ten minutes later, a detective approached Sanchez-Velasco, identified himself, and asked if Sanchez-Velasco would be willing to talk to him about Kathy's murder. Sanchez-Velasco replied that he would talk to them, but only in Hialeah. Without assistance and without handcuffs, he got into the back seat of an unmarked Hialeah police car. During the drive to Hialeah, Sanchez-Velasco spontaneously *911 stated that he wished to go to the Newport Hotel to retrieve some property and that the least he could do was give the jewelry back to Kathy's mother. At this point, Sanchez-Velasco had been told nothing concerning the facts of the case. He led them to the rear of the hotel near the beach, and he searched near a pile of wood without finding anything but a straw hat. The ride to Hialeah then resumed, and Sanchez-Velasco again broke the silence, remarking in Spanish that he would prefer to go to the electric chair right away rather than to "rot in jail."
Evidence presented at trial indicates that when they arrived at the Hialeah police station, the officers gave proper Miranda[2] warnings to Sanchez-Velasco before discussing the case and that he declined attorney representation and waived his rights. According to Sanchez-Velasco's statements to the police, on the night of the murder he slept from the time of Ms. Molina's departure for work until 7 or 8 p.m., when he was awakened by the sound of Kathy on the phone with her sister. Later, he reheated some food for Kathy, which she ate. She then asked Sanchez-Velasco if he still loved Maria (his former girlfriend), and he responded by grabbing Kathy by the neck with both hands. She fell on the bed, and he pulled her T-shirt up around her neck, twisting it like a tourniquet. Kathy fell to the floor, so he stood on the bed and used the twisted T-shirt to lift her back onto it. She did not make any noise, and he believed she was dead. He then removed her clothes, then his own, and he raped her. Sanchez-Velasco then took Kathy's jewelry and other property, called a taxi, and left around midnight after covering Kathy's body with a blanket.
At a hearing on a motion to suppress the above statements, the trial judge found that: (1) the statements were all voluntarily made; (2) appellant had voluntarily entered the police car and had traveled to the Hialeah police station of his own volition; and (3) probable cause existed to arrest Sanchez-Velasco for grand theft and for murder. In making the determination that Sanchez-Velasco had voluntarily entered the vehicle, the trial judge also considered Sanchez-Velasco's statements that he had considered turning himself in to the police and that he had also contemplated suicide.
Evidence at trial also established that Sanchez-Velasco had arrived at a hotel by taxi around 12:30 to 12:45 a.m. on December 13, 1986. He asked the night clerk if he was interested in purchasing a white fur coat or one of two neck chains. At trial, the night clerk identified one of the chains that Sanchez-Velasco had offered to sell him. That chain had previously been identified as one of those taken from Kathy the night of the murder.
Blood samples were taken from both Kathy and Sanchez-Velasco. His blood sample revealed that he has blood type "A" and a "PGN" of 1-2-. "A" antigens found in Sanchez-Velasco's saliva established that he is a secreter. Kathy's blood standard indicated that she had blood type "O" and a "PGN" of 1+2+. An expert testified that Kathy would not naturally have "A" antigens in her body fluids. However, analysis of vaginal and cervical swabs revealed the presence of sperm, "A" antigens, and other enzymes consistent with someone with blood type "A" having had sex with the child. In addition, sperm consistent with appellant's blood type was also found on the sheets on Kathy's bed. Also examined from the crime scene were hair and fiber samples. One of the hairs submitted was from a Caucasian and was coated with a substance which tested positive as blood. The hair was consistent with the defendant's pubic hair standards. Finally, appellant's fingerprints were found on the dresser in Kathy's room.
Prior to trial, Sanchez-Velasco was examined for competency at the time of the offense and competency to stand trial. He was found competent in both instances. At the trial, Sanchez-Velasco interrupted the proceedings during the testimony of one of the police officers, exclaiming that the officer was lying.[3] Defense counsel moved for *912 a mistrial and for examination of the competence of the appellant. The examination determined that the appellant was competent. The trial court denied the motion for mistrial and found that he was competent to proceed. Sanchez-Velasco chose not to testify during the guilt phase of the trial, and he put on no other evidence. The jury found Sanchez-Velasco guilty of first-degree murder, sexual battery of a victim under twelve years of age, and theft as a lesser included offense of grand theft. He was found not guilty of burglary.
During the penalty phase, the state again presented the medical examiner, who testified extensively concerning the pain that Kathy endured from both the rape and the strangulation. The defense presented a mental health expert who testified that Sanchez-Velasco was suffering from an emotional disturbance, though he was legally sane, and that the crime was "an impulsive, violent outburst of a person tainted with some disorder." The psychologist also testified that Sanchez-Velasco had been hospitalized in Cuba, but there was no indication that he had received psychiatric treatment. Sanchez-Velasco told the psychologist that he had no problems with drugs or alcohol.
Against the wishes of his attorney, Sanchez-Velasco made a statement to the jury on his own behalf. During his statement, Sanchez-Velasco apologized for his outburst on August 12; stated that he previously had been convicted of three minor offenses; claimed to have had numerous relationships with women who had children, similar to the relationship he had with Marta; claimed to love children; stated that the officers forced him to accompany them from Miami Beach to Hialeah; stated that the detectives lied when they said he did not demand his rights; denied being the person who made the tape-recorded confession; claimed to have been beaten into the confession; denied ever seeing Marta's coat; asserted that a man of his age could not have inflicted the vaginal lacerations about which the medical examiner had testified; and stated that he was neither under the influence of extreme emotional or mental disturbance at the time of the crime nor mentally ill or unable to appreciate the criminality of his conduct. At the conclusion of the penalty phase, the jury recommended the death penalty by an eight-to-four vote.
Additional mental health testimony was presented to the trial judge before sentencing. The defense psychologist stated she was unable to reach firm conclusions concerning Sanchez-Velasco's mental state. She believed that Sanchez-Velasco was not suffering from organic brain damage, but she thought he might be out of touch with reality and that he possibly had a neuropsychological dysfunction. In addition, the psychologist discussed his refusal to serve with the Cuban military in Angola and his resulting hospitalization, as well as his relationships with and aggression towards women. She could not be sure if Sanchez-Velasco was operating under a mental or emotional disturbance at the time of the crime, but she conceded that she did not address his competency at that time or his ability to appreciate the criminality of his conduct. She concluded, however, that he was competent at the time when she interviewed him.
*913 The trial court found two aggravating circumstances. It determined that the capital felony was especially heinous, atrocious, or cruel and explained:
The medical examiner, Dr. Alvarez, testified that the child was alive for at least three minutes after the Defendant began to choke and rape her; that in addition to the shock of having a trusted adult choking her and raping her she suffered panic of not being able to breathe. The medical examiner further testified that the victim suffered a 5-6 centimeter laceration or tearing to the opening of the vagina and a 4-5 centimeter laceration at the back of the vagina; that the injury was likely to cause extreme pain before the child died. The injury was consistent with the forcible rape of a child of eleven by a grown man.
The trial court found as the second aggravating circumstance that the capital felony was committed while the defendant was engaged in the commission of a sexual battery. With regard to the mitigating circumstances, the trial court stated that it "could find no evidence of any mitigating circumstances either statutory or nonstatutory." In making this determination, the trial judge explained why he did not find an extreme mental or emotional condition as a mitigating circumstance and expressly rejected the expert testimony of the two defense witnesses.

The Guilt Phase
Sanchez-Velasco raises three points concerning the guilt phase of the trial. He contends that: (1) the trial court erred in denying the motion to suppress the confession; (2) the trial court erred in permitting all jurors to be excused who expressed opposition to the imposition of the death penalty; and (3) the trial court erred in failing to grant a mistrial as a result of Sanchez-Velasco's outburst during the course of the trial.
With regard to the first claim relating to the suppression of the confessions, admissions, and other inculpatory statements, Sanchez-Velasco contends that such evidence flows from his illegal arrest in Miami Beach and must be suppressed under the "fruit of the poisonous tree" doctrine, as set forth in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). He argues that, by taking him into custody on less than probable cause for arrest, the police officers violated his fourth amendment rights, and thus his confessions obtained during that detention are inadmissible even if the fifth amendment was complied with by the use of Miranda warnings. He asserts that this conclusion is justified since there was an insufficient break between the illegal arrest and the confession.
It is clear from this record that the Hialeah police officers stopped, patted down, handcuffed, and arrested Sanchez-Velasco while out of their jurisdiction. The officers did consider him to be either a suspect or a material witness in the murder investigation. After the owner of the allegedly stolen stereo failed to document its value and indicated that he no longer wished to press charges, and after consulting with the state attorney's office, the police removed the handcuffs from Sanchez-Velasco. While the officer's testimony established that Sanchez-Velasco was not, in the officer's mind, free to leave, he also was not told to remain. Sanchez-Velasco walked unrestrained to the side of the road and sat down. Approximately ten minutes later, in response to a request by one of the investigating officers, Sanchez-Velasco agreed to discuss the murder of Kathy Encenarro in Hialeah, and he voluntarily entered the police car.
Based on this evidence, the trial court found that Sanchez-Velasco had voluntarily entered the police car for the drive to Hialeah and voluntarily made the statements to the officers. During the hearing on the motion to suppress, the trial judge noted that "apparently he was contemplating turning himself in or really taking his own life at one time and for that reason, I think it's consistent with him going with him voluntarily." Indeed, in his statement to the police, Sanchez-Velasco stated, "[F]irst I thought of taking a pistol and putting a bullet through myself, and then I thought in that I get myself some poison, *914 and I'd call the police later, I don't know what I was thinking of... ."
Although these events initially began as a citizen's arrest by law enforcement officers outside of their jurisdiction, that arrest was not the basis under which Sanchez-Velasco entered the unmarked police car and proceeded with the officers to Hialeah. We find that, in light of this record, the trial judge had sufficient, competent evidence to find that Sanchez-Velasco had voluntarily entered the police vehicle.
The United States Supreme Court, in Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), addressed the situation where a tainted arrest was followed by an apparently voluntary confession. The Court concluded that even if such a confession is made subsequent to Miranda warnings, such warnings, in and of themselves, may not be sufficient to remove the taint of an illegal arrest. The Court stated:
It is entirely possible, of course, as the State here argues, that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality. But the Miranda warnings, alone and per se, cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited.
... The question of whether a confession is the product of a free will under Wong Sun must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant. The voluntariness of the statement is a threshold requirement. And the burden of showing admissability rests, of course, on the prosecution.
422 U.S. at 603-604, 95 S.Ct. at 2261-2262 (citations omitted, footnotes omitted). The Court, in Brown, decided that the state failed to sustain the burden of proving that the evidence at issue was admissible, since there was no break between the arrest and the statements and since the arrest was obviously improper and gave "the appearance of having been calculated to cause surprise, fright, and confusion." Id. at 605, 95 S.Ct. at 2262.
We find that the instant case is distinguishable from Brown. In the instant case, unlike the situation in Brown, there was a significant intervening event between Sanchez-Velasco's initial arrest and his statements and confessions  he was released from apparent custody and control of the officers. Further, unlike the police in Brown, the Hialeah officers initially believed that the arrest was lawful, and they promptly corrected their actions when they discovered that it was not and proceeded to act as they would with a material witness in a first-degree murder case. We conclude that a justifiable basis exists for the trial court to find that Sanchez-Velasco entered the police car voluntarily and agreed to proceed to the Hialeah police station. If there had been no arrest for the theft of the stereo, and if the police officers had asked him if he would talk to them about Kathy's murder since he was the last person to see Kathy alive, Sanchez-Velasco's statements would in no way be tainted, since he voluntarily went with the police to the police station in Hialeah. Given that the police removed his handcuffs and left him alone for ten minutes or so, we believe that such a break is sufficient to hold that the invalid arrest did not taint the subsequent voluntary statements made by Sanchez-Velasco.
We further agree with the trial court that the statements which Sanchez-Velasco *915 made while he was in the police car are not the result of any inquiry and that the police officers gave him a proper Miranda warning prior to his confession at the Hialeah police station. In conclusion, we reject Sanchez-Velasco's contention that Wong Sun applies, and we find that his statements and confessions were admissible at his trial. Cf. New York v. Harris, ___ U.S. ___, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990).
Sanchez-Velasco's second claim in this appeal is that the errors allegedly committed during the jury selection were so egregious as to cause reversal and remand for a new trial. He objected to the following question asked of potential jurors: "Do you have any philosophical, moral, religious or conscientious scruples against the infliction of the death penalty in a proper case?" He contends this question violated his right to an impartial jury. We disagree. The standard for determining when a prospective juror may be excluded because of his views on the death penalty is found in the United States Supreme Court's decision in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). In Witt, that Court stated:
That standard is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." We note that, in addition to dispensing with Witherspoon's reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully infra, this is why deference must be paid to the trial judge who sees and hears the juror.
469 U.S. at 424-26, 105 S.Ct. at 852-53 (footnotes omitted).
After reviewing the entire record of the voir dire, we conclude that the trial court properly handled the voir dire proceedings. Had the judge eliminated jurors based on an affirmative answer to the above-quoted question alone, he clearly would have been violating Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), since this precise language had been rejected as a basis for disqualifying jurors in that opinion. See id. at 515 n. 9, 88 S.Ct. at 1773 n. 9 ("it cannot be assumed that a juror who describes himself as having `conscientious or religious scruples' against the infliction of the death penalty or against its infliction `in a proper case' thereby affirms that he could never vote in favor of it or that he would not consider doing so in the case before him") (citation omitted). In the present case, however, the judge went on to ask each venireperson who responded affirmatively whether he could put his personal convictions aside and vote to recommend the death penalty where the law requires it. The judge disqualified only those venirepersons who indicated unequivocally in final inquiry that they could not.[4] While the initial question was not adequate by itself, it was proper because it was used merely as a screening tool and was followed *916 by extensive inquiry. We emphasize that no venireperson was eliminated who indicated in any way that he or she could follow the law.
We also reject as without merit Sanchez-Velasco's claim that the trial court erred by permitting the parties to "backstrike" potential jurors. The court could not have kept the parties from challenging jurors at any time prior to the swearing of the panel. See Jackson v. State, 464 So.2d 1181 (Fla. 1985).
The final claim in the guilt phase raised by Sanchez-Velasco is that the trial court should have granted a mistrial because of his outburst at the trial which necessitated the immediate removal of the jury and a psychiatric examination to determine his competence to proceed with the trial. We find no error in the trial court's denial of the motion for a mistrial. See Duest v. State, 462 So.2d 446 (Fla. 1985).

The Penalty Phase
Sanchez-Velasco raises three claims of error in the penalty phase. He asserts that: (1) the aggravating circumstance that the felony was especially heinous, atrocious, or cruel is vague and consequently unconstitutional; (2) the trial court erroneously used a nonstatutory aggravating circumstance; and (3) the trial court failed to find as mitigating circumstances that Sanchez-Velasco was acting under extreme mental or emotional distress and that he was unable to appreciate the criminality of his conduct.
With regard to the first point, we have previously addressed the claim that the aggravating circumstance of heinous, atrocious, or cruel is impermissibly vague and does not provide the jury with enough guidance. This Court has expressly limited the definition of this aggravating factor in our opinion in State v. Dixon, 283 So.2d 1 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). Moreover, the use of this aggravating circumstance by trial judges, who are the actual sentencers in Florida, has been specifically approved. See Hildwin v. State, 531 So.2d 124 (Fla. 1988), affirmed, 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989). We note that the trial court not only found the aggravating circumstance of heinous, atrocious, or cruel, but also expressly set forth in the record the justification for such a finding. Further, we find that the claim that this factor was not established beyond a reasonable doubt is totally without merit. Substantial evidence was presented during the guilt and penalty phases to establish this aggravating factor, including the rape evidence which was properly considered during the penalty phase.
In his second claim, Sanchez-Velasco asserts that the trial court's statements in its sentencing order concerning his evil mind, superego, and tendency to lash out at others constituted a nonstatutory aggravating circumstance. These statements appear in the court's discussion of the mitigating circumstances, but the court was explaining what it believed was Sanchez-Velasco's mental condition and why it did not find the expert opinions sufficient to establish the mitigating factor of an extreme mental condition. The trial court did not find that Sanchez-Velasco had a "dangerous mental state" which necessitated a penalty designed to protect the public. We reject the contention that the trial court improperly used a nonstatutory aggravating circumstance in its sentencing order.
In his final point, Sanchez-Velasco alleges that the trial court erred by not finding the two statutory mitigating circumstances he had asserted  that he was acting under extreme mental or emotional distress and that he was unable to appreciate the criminality of his conduct. This record reflects that the testimony concerning Sanchez-Velasco's mental state was not without equivocation and reservation, and the evidence was such that the judge was well within his authority to deny the applicability of the mitigating factors.
For the foregoing reasons, we affirm the convictions and sentences, including the sentence of death.
It is so ordered.
*917 SHAW, C.J., and OVERTON, McDONALD, EHRLICH, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[1] Art. V, § 3(b)(1), Fla. Const.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] The colloquy at trial was as follows:

THE DEFENDANT: Excuse me, excuse me, Your Honor.
THE COURT: You want to hold it?
THE DEFENDANT: Excuse me, your honor. Judge, I can't believe it.
MR. HIRSCHHORN: Can we have the jury taken out, please?
THE DEFENDANT: The man represents the law; can't believe a man can lie like that. I never told you that.
THE COURT: Please take the jury to the jury room.
THE DEFENDANT: I can't believe you supposed to lie 
THE COURT: Would the clerk please take the jury to the jury room?
THE DEFENDANT: It's impossible. He cannot lie like that, the man's supposed to represent the law.
I'm sorry, I can't stay quiet, when I see people lie 
THE COURT: Please take the jury out.
THE DEFENDANT: I can't feel right, I'm sorry, about that. You have to understand that point.
[4] Ms. Sheppard (under no circumstances), Mrs. Bonamy (no matter what the court's instructions), Mr. Pinkney (under no circumstances), Mr. Lavin (even where aggravating circumstances outweigh mitigating), Ms. Hunt (will not follow the law), Mr. Frazer (under no circumstances), Ms. Johnson (cannot follow the court's instructions). Only Ms. Melvin's response was less than certain; after repeated attempts by the judge to clarify her position, Ms. Melvin expressed real doubt that she could follow the law: "I'm not sure that I would be able to go by the evidence."