[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 2, 2002
THOMAS K. KAHN
CLERK

_____

Nos. 01-13969

_____

D.C. Docket No. 98-02967-CV-DMM


RIGOBERTO SANCHEZ-VELASCO,

Petitioner-Appellant,

versus

SECRETARY OF THE DEPARTMENT
OF CORRECTIONS,

Respondent-Appellee.


_____

Appeal from the United States District Court for the
Southern District of Florida

_____

**(April 2, 2002)**


Before CARNES, HULL and WILSON, Circuit Judges.

CARNES, Circuit Judge:

Rigoberto Sanchez-Velasco is a Florida death row inmate.  He is under sentence of death for the brutal rape and murder of an eleven year old girl who had been left in his care  by her mother.   While on death row for that crime, he has murdered two inmates.  As he explained to the district court in this proceeding:  "I hate people, I don't like them, I want to kill people.  You understand?"   When asked by an interviewer how he made the shank he used to kill his two fellow inmates he declined to tell, explaining that he plans to make more shanks to use against other inmates in the future.  Professing that he will kill or attempt to kill again in the future, Sanchez-Velasco insists that he wants his death sentence to be carried out.

Todd Scher and the  Capital Collateral Regional Counsel (CCRC) of Florida, however,  do not want Sanchez-Velasco's death sentence to be carried out.  CCRC is an entity created by the Florida Legislature to provide post-conviction representation to indigent death row inmates in that state, see Fla. Stat. §§ 27.701 - 27.708 (1990), and Todd Scher is the litigation director of that organization's South Florida office.  In order to prevent the death sentence from being carried out, Scher filed a 28 U.S.C. § 2254 petition in the district court without Sanchez-Velasco's consent and without even telling him he was going to do it. In fact,

neither Scher nor anyone else from CCRC made any attempt to speak with Sanchez-Velasco about his case until after he had learned of the petition they had filed in his name and had sent the court a pro se motion to dismiss it. The district court granted Scher limited standing to proceed, appointed an expert to examine Sanchez-Velasco, and conducted an evidentiary hearing after which it concluded that he was mentally competent to decide whether such a petition should be filed. As a result, the district court granted Sanchez-Velasco's motion to dismiss the petition that Scher had filed without his permission. This is Scher's appeal from that decision.

Although we find no fault with the district court's conclusion that Sanchez-Velasco is mentally competent to decide his own fate, we disagree with the court's ruling that Scher and CCRC, who are strangers to Sanchez-Velasco, have limited standing to challenge his mental competency. We also disagree with the district court's decision to appoint an expert to examine Sanchez-Velasco again and to conduct an evidentiary hearing on his mental competency, after the state courts had already decided the issue. Those errors, however, did not harm Scher's side of the case but instead gave him more than he was entitled to receive. We affirm the district court's judgment dismissing the habeas petition that Scher filed.

## I. PROCEDURAL HISTORY

## A. The Trial and Sentence Proceedings

In August 1988, Sanchez-Velasco was tried and convicted for the murder, sexual battery, and robbery of young Kathy Encenarro in December of 1986. Before trial, Sanchez-Velasco's counsel requested that he be evaluated both for competency to stand trial and for sanity at the time of the offense. The trial court appointed six mental health experts – Drs. Riechenberg, Marina, Haber, Berglass, Mutter, and Jaslow – to examine him; he was examined by each of them; and none of them found him either insane at the time of the crime or incompetent to stand trial. During the trial, after Sanchez-Velasco had interrupted the testimony of a government witness with an outburst, his counsel asked that he be evaluated again for competency to stand trial. He was examined by two new doctors – Drs. Castiello and Jimenez – both of whom found him to be competent. At the conclusion of the guilt phase of the trial, the jury found Sanchez-Velasco guilty of murder, sexual battery, and theft. Sanchez-Velasco v. State, 570 So. 2d 908, 912 (Fla. 1990) (Sanchez-Velasco I).

At the penalty phase of the trial, the defense presented the testimony of Dr. Haber, who had examined Sanchez-Velasco before trial, and who testified that he had an emotional disturbance but was legally sane. Sanchez-Velasco v. State, 702 So. 2d 224, 225-26 (Fla. 1997) (Sanchez-Velasco II). Sanchez-Velasco himself

4

also made a statement to the jury, in which he denied that he was mentally ill, emotionally disturbed, or unable to appreciate the criminality of his conduct. Sanchez-Velasco I, 570 So. 2d at 912. At the conclusion of the penalty phase, the jury recommended the death penalty by an eight to four vote. At the sentence proceeding that followed before the judge the defense, seeking again to establish that Sanchez-Velasco's mental condition should serve as a mitigating circumstance, presented another psychiatrist. This one, Dr. Marina, who had examined him before trial, testified that Sanchez-Velasco was mentally competent but that he might be suffering from some sort of mental disturbance. Sanchez-Velasco II, 702 So. 2d 224 at 226.[1] Ultimately, the court rejected the opinions the two defense mental health experts had given during the penalty phase of the trial, and concluded that Sanchez-Velasco, in addition to being undisputably competent, had no extreme mental or emotional condition that might mitigate against a death sentence, and it imposed one. Sanchez-Velasco I, 570 So. 2d at 910-13.

Counting them up, from the pretrial through the sentencing stage Sanchez-Velasco was examined for competency by eight different experts, and each one

---

[1]Later, during Sanchez-Velasco's post-conviction proceedings, Dr. Marina would reverse her opinion and say that Sanchez-Velasco is incompetent, not on the basis of another examination, but because of reading two reports by other experts who reached that conclusion. See footnotes 7 and 12 below.

concluded he was mentally competent.  Sanchez-Velasco II, 702 So. 2d at 226.

There was no disagreement about that.

## B. The State Post-Conviction Proceedings

Sanchez-Velasco's conviction and death sentence were affirmed on direct

appeal in 1990.  Sanchez-Velasco I, 570 So. 2d at 916.   In May of 1993, lawyers

representing him filed a motion pursuant to Florida Rule of Criminal Procedure

3.850 seeking to have his conviction and death sentence overturned.  CCRC, which

generally handles the state post-conviction representation of inmates sentenced to

death in Florida, could not represent Sanchez-Velasco because of a conflict of

interest stemming from a CCRC attorney's representation of a client in a case in

which Sanchez-Velasco was a witness.   As a result, Sanchez-Velasco was

represented by lawyers from the Volunteer Lawyers Resource Center, and by

Michael Bowen, an attorney who handled the case pro bono.  (The lawyers from

the VLRC eventually withdrew from their representation of Sanchez-Velasco in

the post-conviction proceeding, leaving just Mr. Bowen as his attorney.)  In any

event, the Rule 3.850 motion was filed, and initially litigated, the old fashioned

way – with Sanchez-Velasco's knowledge and consent.

Notwithstanding his earlier consent to the filing of the Rule 3.850 motion, in

March and April of 1994 Sanchez-Velasco wrote two letters to the Governor of

6

Florida asking that he be permitted to waive his right to challenge his conviction and sentence in the ongoing post-conviction proceedings. The Governor forwarded those letters to the state trial court, which appointed three experts to examine Sanchez-Velasco and determine if he was mentally competent to waive the post-conviction proceedings.[2] Sanchez-Velasco's brother then filed a next friend petition with the Florida Supreme Court to stay all proceedings that would expedite the execution. That petition was denied without elaboration. Sanchez v. Wilson, 639 So. 2d 980 (Fla. 1994). In May of 1994, Sanchez-Velasco wrote a letter to the state trial court withdrawing his request to waive his right to state post-conviction proceedings, but he later renewed his waiver request in a letter to the Governor dated June 20, 1995. In that letter, Sanchez-Velasco explained that he had withdrawn his initial waiver request because his lawyers had surrounded him with family who persuaded him not to drop his post-conviction proceedings.

In October 1995, the state trial court held a colloquy with Sanchez-Velasco about his request to forego any further attack on his conviction and sentence. When the court asked Sanchez-Velasco whether he wanted to waive his post-conviction proceedings, he demanded "the right to explain himself" before he

---

[2]Those three experts never did examine Sanchez-Velasco, because he withdrew his effort to waive the post-conviction proceedings before they had an opportunity to evaluate him.

would answer that question.  The court told Sanchez-Velasco that he would have an opportunity to explain but that he must first answer the question.  When Sanchez-Velasco repeatedly refused to answer before being allowed to explain, the trial court concluded Sanchez-Velasco did not sincerely want to waive his state post-conviction proceedings and therefore allowed the Rule 3.850 proceeding to go forward.  Eventually, the court set an evidentiary hearing on two of the claims raised in the Rule 3.850 motion.

One of those two claims for which the evidentiary hearing was scheduled asserted that Sanchez-Velasco had been incompetent to stand trial and had been erroneously determined to be competent because his evaluating psychologists and psychiatrists had lacked information about his background and medical history.  In support of that claim, Sanchez-Velasco's lawyers planned to introduce testimony from two experts– Drs. Whyte and Herrera–who had at Sanchez-Velasco's lawyers' request each evaluated Sanchez-Velasco twice, first in 1993 and again in 1994, and had concluded that he suffered from significant psychological disorders that rendered him mentally incompetent.  Sanchez-Velasco II, 702 So. 2d at 226. Copies of their 1993 reports had been attached to Sanchez-Velasco's Rule 3.850 motion, and copies of their 1994 reports had been attached to the next-friend

petition Sanchez-Velasco's brother had filed that year in the Florida Supreme Court.[3]

On October 24, 1996, at the beginning of the evidentiary hearing, and before any evidence was presented, Sanchez-Velasco moved to discharge his counsel, Mr. Bowen, and again asked to be allowed to waive the post-conviction proceedings. The state trial court observed that Sanchez-Velasco "appears very intelligent" and "appears to be very competent" but ordered a competency evaluation out of an abundance of caution. Sanchez-Velasco II, 702 So. 2d at 226. The next day, Sanchez-Velasco was evaluated by Dr. Sonia Ruiz, a clinical psychologist. She concluded that he was mentally competent to participate in legal proceedings, consult with his lawyer, and understand the consequences of his decisions. Id. at 226 - 27. She further found that he did not suffer from any major mental illness or defect. Id. Dr. Ruiz was the twelfth expert who had examined Sanchez-Velasco

---

[3]In 1993, Drs. Whyte and Herrera's reports were shown to Dr. Marina, one of the doctors who had examined Sanchez-Velasco for competency prior to his trial and who had testified for the defense during the penalty phase of the trial. On the basis of those reports and information about Sanchez-Velasco's background provided to her by his lawyers, but without having re-examined him, Dr. Marina wrote a letter in which she reversed her earlier opinion and said Sanchez-Velasco was incompetent. A copy of this letter was before the state trial court during the Rule 3.850 proceedings. Later, in 1994, when Sanchez-Velasco's lawyers were compiling expert opinions in support of Sanchez-Velasco's brother's petition to proceed as Sanchez-Velasco's next friend, Dr. Marina wrote another letter confirming her changed opinion, which was attached to the next-friend petition.

for mental competency for one purpose or another while his case was in the state courts, and she was the tenth one to find him to be competent. Id. at 227-29.[4]

After receiving Dr. Ruiz's report, the state trial court held a hearing on October 25, 1996, at which it conducted a detailed Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525 (1975), type of inquiry to determine whether Sanchez-Velasco was competent to waive the post-conviction attack on his conviction and sentence. Sanchez-Velasco II, 702 So.2d at 227. It did so, because that is the procedure the Florida Supreme Court has mandated in cases where death row inmates seek to drop state post-conviction proceedings. See Durocher v. Singletary, 623 So. 2d 482, 485 (Fla. 1993). During its inquiry, the court asked Sanchez-Velasco if he understood that: (1) by waiving his claims he would lose all right to future appeals of his conviction and sentence; (2) if he prevailed on his claims he would receive a new sentencing hearing; and (3) once his claims were waived he would not have the right to reinstate them in the future. Sanchez-Velasco confirmed that he understood each of those propositions, and when the court asked him again if he wished to withdraw his appeal, he stated that he did.

---

[4]In addition to the eight experts whose examinations and conclusions have already been described in this opinion and Dr. Ruiz, Dr. Richard Greer also examined Sanchez-Velasco in connection with his trial for murdering two of his fellow inmates while he was death row and found him competent to stand trial or plead guilty. That murder and Dr. Greer's examination occurred before the state post-conviction proceedings were completed in this case. Sanchez-Velasco II, 702 So.2d at 226.

10

On October 31, 1996, the state trial court entered an order finding that Sanchez-Velasco was competent to discharge his counsel and dismiss the Rule 3.850 motion, and it dismissed the proceedings.  Sanchez-Velasco's former lawyer, Bowen,  appealed that order, but the Florida Supreme Court affirmed it in December 1997. Sanchez-Velasco II, 702 So. 2d at 228.   In doing so, the Florida Supreme Court concluded that the procedures the trial court had used to determine whether Sanchez-Velasco was competent to dismiss his collateral counsel and post-conviction proceedings complied with the requirements it had set forth in Durocher v. Singletary, 623 So. 2d 482 (Fla. 1993).   The United States Supreme Court denied certiorari review in October of 1998. See 525 U.S. 811, 119 S.Ct. 42.

C.   The Federal Habeas Petition

In December 1998 Todd Scher, in his position as an attorney with CCRC, filed a petition for a writ of habeas corpus in federal district court.  The conflict of interest that had previously prevented CCRC or its attorneys from representing Sanchez-Velasco had been resolved.[5]  However, there was another problem with the filing of the petition. The problem was and is that neither Scher nor anyone else

_____

[5]CCRC's predecessor, the Capital Collateral Representative, had been prevented from representing Sanchez-Velasco in the state court proceedings because of  its representation of another criminal defendant, in whose case Sanchez-Velasco was a witness. That is why Sanchez-Velasco was represented in those state proceedings  by volunteer counsel from the Volunteer Lawyers Resource Center and Michael Bowen.

11

from CCRC had Sanchez-Velasco's permission to file the petition on his behalf or to represent him in this or any other proceeding. They had not even bothered to talk with Sanchez-Velasco about the matter before they purported to act on his behalf. He did not know they were going to do it. He did not know them at all. They were complete strangers to him.

Attempting to explain his actions, Scher's brief to this Court says that he "had spoken with several people, including attorneys, who had contact with [Sanchez-Velasco] and who all indicated that [Sanchez-Velasco] wished to challenge his conviction and sentence in federal court." Apparently, that is not entirely true, because when we pressed Scher at oral argument he admitted that the conversations he claims to have had with those people had merely given him no reason to believe that Sanchez-Velasco did not want him to file the petition. This was also his position before the district court, where he stated that: "I did consult with Mr. Sanchez-Velasco's previous attorneys, I also consulted with people who have seen and constantly visited Mr. Sanchez-Velasco, and had no reason to believe . . . that he would not agree to have this petition filed on his behalf." Scher never explained to either the district court or to us why he thought that Sanchez-Velasco would have gone to such lengths to have his state post-conviction

12

proceeding dismissed so his sentence could be carried out and then want a federal habeas petition to be filed in an attempt to overturn that sentence.

While admitting that he did not even attempt to talk with Sanchez-Velasco before filing the federal habeas petition, Scher claims he did mail a copy of the petition to Sanchez-Velasco after it was filed. Sanchez-Velasco denies that he ever received a copy of the petition. It is not clear that the district court ever resolved this factual dispute, but we will assume for present purposes that Scher did mail and Sanchez-Velasco did receive a copy of the petition shortly after it was filed.[6]

The habeas petition Scher filed in Sanchez-Velasco's name raised a number of claims, including one that Sanchez-Velasco had been incompetent to waive his state post-conviction appeals. No new affidavits or reports were submitted in support of that claim. In its initial response to the habeas petition, the State of Florida contested Scher's standing to file the petition, but the district court did not rule on that issue immediately. Instead, the court stayed any consideration of that issue and of the petition itself until the Supreme Court's released its decision in Williams v. Taylor, 529 U.S. 420, 120 S.Ct. 1479 (2000), concerning

---

[6]In explaining why it was allowing Scher to challenge Sanchez-Velasco's mental competency, the district court referred to the fact that "the petition was filed in December 1998 and Petitioner did not move to withdraw the petition until March 2000." Arguably implicit in that statement is a finding that Scher mailed and Sanchez-Velasco received the petition soon after it was filed. Whether that happened does not, in any event, affect our decision of any of the issues in this case.

the scope of habeas review under the Antiterrorism and Effective Death Penalty Act. During the time that the petition was pending, Scher made no attempt whatever to visit Sanchez-Velasco, or to have someone from his office visit him. During that time CCRC and Scher had a number of other clients located at the same prison as Sanchez-Velasco, and someone from CCRC visited the facility about every week. Yet no one ever attempted to talk with Sanchez-Velasco about the federal habeas petition that had been filed in his name.

In March 2000, fourteen months after Scher had filed the habeas petition, and while the State's challenge to Scher's standing was still pending, Sanchez-Velasco filed a pro se motion to "waive all my legal rights of appeals in any federal and state court." In that motion, Sanchez-Velasco asserted he had a constitutional right "to choose not to be represented by any attorney" unless he had been shown to be incompetent, and he argued that he had exercised his right to decline representation by counsel when he withdrew his Rule 3.850 motion in state court after having been found competent to do so. Sanchez-Velasco explained in the motion he filed in this case that he wished to forego any appeal of his murder conviction and death sentence for two reasons. First, he believed that the trial and sentencing proceedings had been fair: "This petitioner was legally trialed and convicted for the crime he was charged and he believe that he was fairly

14

represented on his trial." Second, he felt he was a dangerous and violent person who posed a threat to others as long as he remained alive: "This petitioner while waiting for his sentence to be carryed out, he has killed two more human being and hurted many others and he believes that the only way the Governor can asure that he won't be able to hurt or to take any more lifes is by carrying out the death sentence that was giving to he by the court of law."

It was only at this point, after Sanchez-Velasco had filed his pro se motion to withdraw his petition, that Scher finally made his first attempt to communicate with the man he claimed to be representing. He went to see Sanchez-Velasco. After meeting once with Scher, and on the same day of that meeting, Sanchez-Velasco filled out and signed a form indicating that he refused to meet any further with Scher, with anyone from CCRC, or with any mental health expert working for CCRC. He did not want to have anything to do with them or for them to have anything to do with him.

The district court issued an order for Scher to show cause why Sanchez-Velasco's motion to dismiss the habeas petition should not be granted. Scher's response argued that Sanchez-Velasco was not mentally competent to dismiss the petition, and attached to it were a number of materials, including affidavits from friends and family, psychological evaluations, and medical records from prison

15

showing that while in prison Sanchez-Velasco had reported psychological problems and had been administered psychiatric drugs in non-therapeutic doses. All of those materials had been considered by the state courts and virtually all of them had been before the state trial court when it found Sanchez-Velasco competent to dismiss his Rule 3.850 motion proceeding.[7]

The district court ruled that Scher had standing enough to challenge Sanchez-Velasco's mental competency to dismiss the federal habeas petition. The court also decided that an independent mental health expert should be appointed to examine Sanchez-Velasco in order to determine his mental competence and that an evidentiary hearing should be held on the issue after that examination. The State filed a motion for reconsideration, again arguing that Scher lacked standing even to challenge Sanchez-Velasco's competency. The court denied that motion for reconsideration.

---

[7]There were three documents that had not been before the state trial court in the Rule 3.850 proceeding. Two of them were reports, one from Dr. Whyte and one from Dr. Herrera, each from 1994 and each describing conclusions drawn after a 1994 examination following up on an earlier 1993 examination and report by the same doctor. And there was Dr. Marina's 1994 letter, in which she described how reading the 1994 reports of Drs. Whyte and Herrera had confirmed her 1993 revised conclusion that Sanchez-Velasco was incompetent. See note 3 above. Although the 1994 documents were not before the state trial court in 1996 when it found Sanchez-Velasco competent to waive his state post-conviction proceedings, each of them had been submitted to the Florida Supreme Court when it considered Sanchez-Velasco's brother's petition to proceed as next friend. See note 12 below.

16

The court asked Scher and the State to agree upon a mental health expert or, alternatively, to submit a list of experts from whom the court could choose one to conduct the examination. Because Scher and the state could not agree on a mental-health expert, each submitted two names. In October 2000 the district court appointed one of the experts the State had suggested, Dr. Richard Greer, Chief of the Forensic Psychology Division at the University of Florida. Dr. Greer had previously examined Sanchez-Velasco in November 1995 for competency to stand trial for the murder of two fellow inmates, and he had found Sanchez-Velasco competent to represent himself and enter a guilty plea in that case. Sanchez-Velasco II, 702 So. 2d at 226.

In January 2001 Dr. Greer, accompanied by his student, Dr. Robert Stetson, examined Sanchez-Velasco, and in February 2001 issued his report. In his report Dr. Greer concluded Sanchez-Velasco did not suffer from any major mental illness and was mentally competent to withdraw his habeas petition. He based this conclusion on his examination of Sanchez-Velasco as well as his review of the medical history and case file. Scher moved to strike Dr. Greer's report and appoint additional mental health experts, but the district court denied that motion.

On May 15, 2001, the district court held an evidentiary hearing. Dr. Greer was the only witness. He testified about his education, training, and experience,

17

his examination of Sanchez-Velasco, and his conclusion that Sanchez-Velasco was competent. All parties, including Sanchez-Velasco himself, were given an opportunity to question Dr. Greer. Scher neither submitted nor attempted to submit any new testimony or other evidentiary material at the hearing. The State submitted Sanchez-Velasco's most recent prison medical records, which showed that he did not currently suffer from any significant mental illness. The State also re-urged its position that Scher did not have standing to even raise the issue of whether Sanchez-Velasco was mentally competent.

At the evidentiary hearing, after Dr. Greer had testified, the district court spoke with Sanchez-Velasco about his desire to dismiss the petition. The court asked him why he wanted to do that, and he told the court: that he had not filed the petition; that he was competent; and that he wanted Scher and CCRC to stop "play game with the system and the taxpayers' money." Sanchez-Velasco pointed out that he already been found competent in state court to waive his post-conviction proceeding there, and that he had again been found competent by Dr. Greer. The court asked him whether he understood "what's going to happen if you don't have an appeal, if you don't have an appeal pending" and he answered: "Sure. My sentence might be carried on sometime whenever the government decided to do so." He then added:

18

And really it not a matter of whether my sentence be carried out or not. The matter is that I won't be able to hurt anybody no more. And meantime, while they're playing with the system and using the system to enrich they pockets, and I continue killing people. I haven't stopped kill people since I been in the DOC department under the DOC supervising. I has killed people repeatedly, repeatedly, repeatedly, even while being on death row. So I don't see myself in other way, is no choice I am making because I want to die . . . but since I been all this year on death row and every year since then hurt somebody or kill somebody, and I haven't do anything, I don't see myself to change my life around. . . .

I has been like that all my life and it is nothing I can do. So to saving my time and saving the government time and saving other people lives, I make my own choice. I have a constitutional right to do so. The Constitution of the United States give me that right.

And I am competent to do so.

The court finally asked, point blank, whether Sanchez-Velasco understood that "if . . .this petition is withdrawn, you will probably be executed," to which Sanchez-Velasco replied "Yes, Your Honor."

After the hearing, the district court issued an order finding that Scher had standing to raise the issue of Sanchez-Velasco's mental competency to forego filing a habeas corpus petition. It also found, however, that Sanchez-Velasco was in fact mentally competent, which meant that Scher lacked standing to litigate the habeas petition he had filed on behalf of Sanchez-Velasco. It was on that basis that the district court dismissed the habeas petition.

D. The Certificate of Appealability

19

Scher sought a certificate of appealability, but the district court denied one. Scher then sought one from this court, and we granted it, on the following three issues:

1)      Whether the Capital Collateral Regional Counsel is "truly dedicated to the best interests" of Sanchez-Velasco, as is required by the first prong of the <u>Whitmore v. Arkansas</u> test for 'next friend' standing, including whether being "truly dedicated to the best interests" requires that the 'next friend' "have some significant relationship with the real party in interest." <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 163, 110 S.Ct. 1717, 1727 (1990).

2)      Whether the district court employed adequate procedures to determine if Sanchez-Velasco was competent to waive his habeas petition. <u>Cf. Mata v. Johnson</u>, 210 F.3d 324 (5th Cir. 2000).

3)      Whether, if the court did use adequate procedures, it clearly erred in finding that Sanchez-Velasco was competent to waive his habeas petition.

## II.  DISCUSSION

Scher claims standing under the "next friend" doctrine, but the Supreme Court has held that "next friend" standing "is by no means granted automatically to whomever seeks to pursue an action on behalf of another." <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 163, 110 S. Ct. 1717, 1727 (1990).  Instead, two requirements must be met:

Decisions applying the habeas corpus statute have adhered to at least two firmly rooted prerequisites for 'next friend standing.'  First, a 'next friend' must provide an adequate explanation–such as

20

inaccessibility, mental incompetence, or other disability–why the real party in interest cannot appear on his own behalf to prosecute the action. Second, the "next friend" must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate, and it has been further suggested that a "next friend" must have some significant relationship with the real party in interest.

Id. at 163-64, 110 S. Ct. at 1727 (internal citations omitted); see also Lonchar v. Zant, 978 F.2d 637, 641 (11th Cir. 1992).

The district court in this case referred to the second prong of the Whitmore test as whether Scher had "standing to even challenge Petitioner's mental competency," and concluded that he did. The court also found, however, that Sanchez-Velasco was mentally competent, which means that Scher failed to meet the first prong of the Whitmore test. The result is that the district court granted Sanchez-Velasco's motion to dismiss the habeas petition that Scher had filed. For the reasons that follow, we think that the district court reached the right result and was correct about Sanchez-Velasco's mental competency, but that it was wrong about Scher having what the court described as limited standing to litigate whether Sanchez-Velasco was mentally competent. In our view, Scher failed to satisfy either of the two Whitmore requirements.

A. The Dedication to Best Interests Prong

Throughout this proceeding, the State of Florida has contested Scher's standing to litigate the issue of whether Sanchez-Velasco can decide for himself

21

about filing a federal habeas petition. From the beginning, the State has contended not only that Sanchez-Velasco is mentally competent to make his own decisions but also that Scher has no right to even litigate that question. The State has, in other words, contended all along that Scher has failed to establish not only the first prong or adequate explanation requirement, but also the second prong or dedication to best interests requirement. That is the position the State took in its initial response to the habeas petition, the position it took in the motion for reconsideration that it filed after the district court had ordered an evidentiary hearing on Sanchez-Velasco's mental competency, and the position it took at the evidentiary hearing. Nothing if not consistent and persistent, the State has also taken that position in its brief and oral argument to this Court.

Despite the State's pertinacity in pursuing the prong-two point, Scher contends that we should not consider the issue of whether he has standing to litigate Sanchez-Velasco's mental competency – whether he meets the second Whitmore prong – because the State failed to cross-appeal the district court's ruling against it on that question. We disagree.

An appellee may, without cross-appealing, urge in support of a result that has been appealed by the other party any ground leading to the same result, even if that ground is inconsistent with the district court's reasoning. See El Paso Natural

22

Gas Co. v. Neztsosie, 526 U.S. 473, 479, 119 S. Ct. 1430, 1434-35 (1999); accord Blum v. Bacon, 457 U.S. 132, 137 n.5, 102 S. Ct. 2355, 2359 n.5 (1982) ("It is well accepted, however, that without filing a cross-appeal or cross-petition, an appellee may rely upon any matter appearing in the record in support of the judgment below."). In addition, because standing issues resonate with Article III concerns we are under an obligation to consider standing at every step in the judicial process even if the parties do not press it or have acted or failed to act in a way that would have waived some other issue. United States v. Hays, 515 U.S. 737, 742, 115 S.Ct. 2431, 2435 (1995); FW/PBS, Inc. v. Dallas, 493 U.S. 215, 230-31, 110 S.Ct. 596, 607-08 (1990).

Turning now to the question of whether Scher has established the dedication to the best interests prong, we begin by reiterating the Supreme Court's precise language. It said: "the 'next friend' must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate, and it has been further suggested that a 'next friend' must have some significant relationship with the real party in interest." Whitmore, 495 U.S. at 163-64, 110 S. Ct. at 1727.

As to that latter part, about "some significant relationship," we have previously indicated that it may not be an additional, independent requirement but instead may be one means by which the would-be next friend can show true

23

dedication to the best interests of the person on whose behalf he seeks to litigate. See Lonchar v. Zant, 978 F.2d 637, 641 (11th Cir. 1992) ("Then, the next friend must show some relationship or other evidence that would suggest that the next friend is truly dedicated to the interests of the real party in interest."). We have concluded that "some significant relationship" does exist when the would-be next friend has served in a prior proceeding as counsel for the real party in interest and did so with his consent. That was the situation in the Ford case, where the attorney who was acting as next friend for the inmate had represented him with his consent for years in prior litigation challenging his conviction and death sentence. See Ford v. Haley, 195 F.3d 603, 605 & n.1 (11th Cir. 1999), and Ford v. Haley, 179 F.3d 1342, 1344-45 (11th Cir. 1999); see also Hauser ex rel. Crawford v. Moore, 223 F.3d 1316, 1322 (11th Cir. 2000) ("The most logical 'next friend' is Hauser's court-appointed counsel" from prior proceedings). We have also indicated that "some significant relationship" exists and the second Whitmore prong is satisfied where a close relative acts as next friend. See Lonchar, 978 F.2d at 641 ("The district court held and no one disputes that Kellogg, as Lonchar's sister, is sufficiently dedicated to the interests of her brother."); but see Hauser, 223 F.3d at 1322 (expressing reservations about whether the inmate's biological

mother, who gave him up for adoption, was dedicated to his best interests for next-friend purposes).

Neither of those situations exist here. Sanchez-Velasco's brother attempted to act in a next-friend capacity and pursue state court remedies on his behalf, but he has not done that in federal court. Scher is not related to Sanchez-Velasco. He has never represented him before. Prior to filing the federal habeas petition (and for more than a year afterwards) Scher had never met Sanchez-Velasco. He had never spoken with him. He had never even attempted to do so. Scher was, in short, a total stranger to Sanchez-Velasco. He had no relationship at all with him, much less a significant one.

Nor has Scher shown in any other way that he is "truly dedicated to the best interests of the person on whose behalf he seeks to litigate" within the meaning of that Whitmore requirement. Scher, as a CCRC attorney, does have state law authority to represent death row inmates who consent to the representation, but he has no more authority than any other attorney to represent an unconsenting inmate. That is true as a matter of federal law under the Whitmore decision, and it is true as a matter of state law as well, see Durocher v. Singletary, 623 So. 2d 482, 485 (Fla. 1993) ("[W]e hold that . . . CCR [CCRC's predecessor] has no duty or right to represent a death row inmate without that inmate's permission."); cf. Faretta v.

California, 422 U.S. 806, 821, 95 S. Ct. 2525, 2534 (1975) ("An unwanted counsel 'represents' the defendant only through a tenuous and unacceptable legal fiction.").

The district court gave three reasons for finding that Scher had met the second prong of the Whitmore test, none of which we find persuasive. First, it said that in this case Scher had "followed [CCRC's] standard procedures in filing the habeas petition on Petitioner's behalf." If that is so, then CCRC's standard procedures should be changed. They should be changed because they are contrary to Florida law, which is that CCRC has no right to represent a death row inmate without that inmate's permission. Durocher, 623 So. 2d at 485. CCRC's standard procedures, if this is what they are, ought to be changed because no attorney should ever file a habeas petition in the name of an inmate he has not even bothered to speak with, much less obtain permission from, and omit from the petition the critical fact that the inmate has not consented to the filing. See Fla. Stat. Bar R. 4-1.2(a) ("A lawyer shall abide by a client's decisions concerning the objectives of representation...and shall consult with the client as to the means by which they are to be pursued."); id. at 4-8.4(c) ("A lawyer shall not engage in conduct involving ... misrepresentation. . . "). Nowhere in the two-pound, 272-page habeas petition Scher filed did he disclose to the court that he had not obtained Sanchez-Velasco's

26

permission to file the petition. Regardless of whether CCRC followed its standard procedures in this case, or whether those procedures ought to be changed, its practices or procedures cannot trump the requirements of federal law; they cannot take the place of the showing <u>Whitmore</u> requires that the would-be next friend be dedicated to the best interests of the inmate.

The second reason that the district court gave for concluding that Scher could proceed to litigate Sanchez-Velasco's mental competency is that "the petition was filed in December 1998 and Petitioner did not move to withdraw the petition until March 2000," which the court described as being at a "late stage." But there were no earlier stages because nothing happened in the case, which was held in abeyance pending a decision from the Supreme Court in <u>Williams v. Taylor</u>, 529 U.S. 420, 120 S. Ct. 1479 (2000), during the interval between Scher's filing of the petition and Sanchez-Velasco's filing of the motion to dismiss, except the State's response which also asked the court to dismiss because Scher could not show the prerequisites for next-friend standing. Besides, we are not aware of any doctrine which would entitle a stranger to control the legal affairs of another party after that party protested based upon nothing more than the lateness of the protest.

It is not as though the doctrine of laches applies to next-friend standing, and even if it did the requirements of that doctrine would not be met in this case.[8]

The third reason the district court gave for allowing Scher to challenge Sanchez-Velasco's mental competency is that "since this is a capital case, and similar issues related to Petitioner's mental competency could be raised potentially by a third party prior to execution, it makes additional good sense to allow CCRC to litigate Petitioner's mental competency to withdraw his habeas petition." This reason at least has the virtue of being pragmatic, but there is no pragmatic exception to the requirements of next-friend standing. If we were to sanction the district court's reasoning, it would be tantamount to writing the second prong out of the Whitmore test, something we cannot do, because the Supreme Court wrote it in.[9]

---

[8]This is not a case in which counsel who had been representing an inmate with consent in prior proceedings assumed the inmate would want to continue with the relationship as the legal challenge moved to another court. Even in that situation, we would think the attorney would want to communicate with the inmate before filing a new petition in a different court, although we do not mean to imply that is required. All we address are the facts before us in this case.

[9]We do not mean to say that a district court must decide the second Whitmore prong before it decides the first one, or that it must address both prongs where one of them is not met. See Hauser ex rel. Crawford v. Moore, 223 F.3d 1316, 1321 (11th Cir. 2000) (disposing of the case on the first prong without reaching the second one). A court can consider pragmatic considerations in deciding how to proceed. But what a court should not do is rule that the second Whitmore prong is met because it "makes good sense" to rule that way even if the requirements of that prong are not met. If the district court had skipped over the second prong because the first one was not met, that would have been fine. Likewise, if it had held that neither prong was met, that would have been fine. What we disagree with is what we understand to be the district court's ruling that the second prong was actually met in this case. It was not.

Scher offers no better reasons than the district court did for why we should find that he has met the second prong of the Whitmore test by showing that he is dedicated to the best interests of Sanchez-Velasco. Attempting to excuse his failure to ask for Sanchez-Velasco's permission before filing the petition in his name, Scher says he was busy drafting the petition before the statute of limitations ran out. That assertion is both incredible, and beside the point. It is incredible, because Scher admits that he or others from his CCRC office visit the prison where Sanchez-Velasco was being held each week, and obviously the phone lines run to and from the prison. Yet during all the time Scher was compiling the mammoth petition and appendices to file, Scher never once attempted to contact his purported client about the fundamental question of whether he wanted to be Scher's client. Not only that, but even after the petition was filed Scher made no attempt to visit or talk with Sanchez-Velasco until fourteen months had passed, and he only went to see him then because Sanchez-Velasco had filed a motion to dismiss the petition as unauthorized. Scher's assertion about being busy is also beside the point, because there is no "too busy" exception to the second Whitmore requirement.

Scher has not established that he is dedicated to Sanchez-Velasco's best interests. To the contrary, he appears to be pursing his own interests in opposing the imposition of the death penalty. See Hauser, 223 F.3d at 1322 (noting that the

29

would-be next-friends in that case "appear to be motivated solely by their own desires to block imposition of the death penalty in an attempt to define justice as they see fit" (internal quotation marks omitted)). To allow him to proceed in Sanchez-Velasco's name would run counter to one of the central purposes of the requirements of next-friend-standing, which is to keep out "intruders or uninvited meddlers, styling themselves next friends." Whitmore, 495 U.S. at 164, 110 S. Ct. at 1728 (quotation marks and citation omitted).

The district court should not have ruled that Scher had made the showing required by Whitmore's second prong, that he had, in the district court's words, "limited standing" to litigate Scher's mental competency to decide whether to proceed with the federal habeas petition that Scher had filed without permission. Scher's failure to meet the second prong requirement alone is sufficient reason to affirm the dismissal of the habeas petition.

This case does not present the issue of how the second Whitmore requirement should be applied when there is no one who can meet that requirement and there are serious questions about the mental competency of the inmate that have not been addressed by any court. Sanchez-Velasco's mental competency to forego further legal challenges was fully and completely litigated in the state courts. His brother had previously filed a petition on his behalf in the state courts,

and counsel who represented Sanchez-Velasco in the state collateral proceedings began that representation with his consent. Unlike Scher, the brother and prior counsel have a "significant relationship with the real party in interest" and under our precedent would be considered to be sufficiently "dedicated to the best interests" of Sanchez-Velasco to meet Whitmore's second requirement for next-friend standing. If there is a "last resort" exception to that second requirement, this is not a case where it would apply.

## B. The Adequate Explanation Prong

An independently adequate alternative reason for affirming the district court's dismissal of the petition is that Scher also failed to satisfy the first Whitmore prong, which requires "an adequate explanation–such as inaccessibility, mental incompetence, or other disability–why the real party in interest cannot appear on his own behalf to prosecute the action." Whitmore, 459 U.S. at 163, 110 S. Ct. at 1727. The usual explanation proffered is mental incompetency, and that is the theory on which Scher staked his claim to third-party standing. After appointing an expert to examine Sanchez-Velasco and holding an evidentiary hearing on the issue, the district court correctly concluded that Scher had failed to establish that Sanchez-Velasco is mentally incompetent, but it could and should

31

have reached that conclusion without having an expert examine Sanchez-Velasco and holding an evidentiary hearing.

The district court failed to give the state courts' determination that Sanchez-Velasco was mentally competent to decide for himself whether to pursue further challenges to his conviction and death sentence the presumption of correctness it was entitled to under Demosthenes v. Baal, 495 U.S. 731, 735, 110 S. Ct. 2223, 2225 (1990). The Demosthenes decision requires a federal court to presume that a state court finding of competency is correct. Id.; see also Hauser, 223 F.3d at 1323 ("These subsidiary findings, and the ultimate decision [of the state court] that Hauser is competent, are factual in nature and are entitled to a presumption of correctness."); 28 U.S.C. § 2254(e)(1). The presumed correctness of the state court finding can be overcome only if the party challenging the inmate's mental competency comes forward with evidence that clearly and convincingly establishes incompetency. Hauser, 223 F.3d at 1323 ("In order to rebut these findings, CCRC . . . must present clear and convincing evidence that Hauser is incompetent."). In this case, a state trial court adjudged Sanchez-Velasco competent to waive further legal proceedings. That finding was made in October 1996, and it was affirmed by the Florida Supreme Court in December 1997.

The filing of the federal habeas petition in this case came two years and two months after the state trial court had found Sanchez-Velasco mentally competent, and one year after the Florida Supreme Court had affirmed that finding. That is substantially more time than had elapsed between the state court findings and the filing of the federal habeas proceeding in Demosthenes and Hauser, but it is not so much time as to remove the presumption of correctness, at least where no evidence is offered that the inmate's mental condition has changed in the interval. Cf. Mata v. Johnson, 210 F.3d 324, 332 (5th Cir. 2000) (holding the district court erred in basing a competency determination on a twelve-year-old finding from state trial proceedings when there was extensive new evidence of incompetency).

In the face of a state court determination that the real party in interest inmate is mentally competent, in order to be entitled to a federal evidentiary hearing on the issue a would-be next-friend must proffer evidence that does one of two things. The proffered evidence either must clearly and convincingly establish that the state court finding was erroneous when made, or it must show that even though the state court finding was correct when made the mental condition of the inmate has deteriorated to the point that he is no longer mentally competent. Scher did proffer some evidence in the two-and-a-half pounds of documents appended to the habeas petition, but none of that evidence clearly and convincingly established that

33

the state court's finding about mental competency was erroneous. Nor did any of it show a change in Sanchez-Velasco's condition since the state court findings were made. In fact, the vast majority of the evidence in those documents was before the state trial court when it found that Sanchez-Velasco was mentally competent.[10]

In these circumstances, the district court should not have appointed another expert to examine Sanchez-Velasco yet again, it should not have conducted an evidentiary hearing into the issue, and it should not have made its own independent finding regarding the mental competence issue. Instead, the district court should have accepted as correct the state court finding that Sanchez-Velasco is mentally competent to decide his legal fate.

Alternatively, even if Scher had been entitled to have the district court make its own determination of Sanchez-Velasco's mental condition after appointing another expert to examine him and conducting an evidentiary hearing on the issue, that is what the court did. Scher says the district court made a number of errors

_____

[10]By the time that the district court decided to appoint an expert to examine Sanchez-Velasco and to conduct an evidentiary hearing, Scher had submitted only three pieces of evidence that had not been considered by the state trial court when it found Sanchez-Velasco competent to waive his state post-conviction proceedings. These were the 1994 reports of Drs. Whyte and Herrera, and the 1994 letter of Dr. Marina. See note 7 above. Each of those documents was considered by the Florida Supreme Court in 1994 before it rejected the petition of Sanchez-Velasco's brother to proceed as next friend, and, more importantly, each one in large part duplicated a 1993 report by the same expert that was before the state trial court in 1996 when it found Sanchez-Velasco competent to waive his state post-conviction proceedings.

34

tainting its own finding that Sanchez-Velasco was mentally competent, but we are not convinced by his arguments.

First, Scher argues that the district court abused its discretion in choosing the expert it did to examine Sanchez-Velasco and in failing to appoint an additional expert picked by Scher. The court had asked Scher and the State to agree on an expert to do the examination, or failing that, to submit names from which the court could choose one. They could not agree, so Scher and the State each submitted two names. The court chose Dr. Richard Greer, one of the experts whose name the State had submitted. His qualifications were beyond question. Dr. Greer was Chief of the Forensic Psychology Division of the University of Florida Medical School, where he was professor of neurology and psychiatry, and he had extensive experience in making competency evaluations. He was also familiar with the specific subject matter – Sanchez-Velasco's mind – having conducted an examination as a court-appointed expert in November of 1995 to determine if Sanchez-Velasco was mentally competent to stand trial for the murder of two inmates. (He had found that Sanchez-Velasco was competent at that time to stand trial or plead guilty.)

Scher does not quarrel with Dr. Greer's qualifications. Instead, he argues that, because Dr. Greer was one of the two experts Florida had suggested, the

35

district court should have also appointed an expert of Scher's choosing to evaluate Sanchez-Velasco. Of course, while the State put Dr. Greer's name on the list, it did not select him, the district court did. Given Dr. Greer's sterling qualifications and prior related work involving Sanchez-Velasco, the court had every reason for doing so. Due process did not require the appointment of two experts in these circumstances.[11]

In contesting the fairness of the examination and evidentiary hearing Scher also argues that Dr. Greer's subsequent arrest for possession of cocaine on September 17, 2001, eight months after the examination, seven months after the report, and three months after he had testified at the hearing, potentially tainted his expert opinion. Scher maintains the case should be remanded to the district court with instructions that it consider the information about Dr. Greer's arrest and reweigh his testimony in light of it. Of course, an arrest without a conviction, or the conduct leading to it, cannot be proven by extrinsic evidence. See F.R.E. 608(b). So far as we know and the parties can tell us, Dr. Greer has not been convicted of the crime for which he was arrested. Nor could Scher even cross-examine Dr. Greer about the conduct or arrest unless "in the discretion of the court,

---

[11]Scher also argues that the fact Dr. Greer was accompanied during the examination by one of his students, Dr. Stetson, tainted the process, but none of his arguments in that respect merit further discussion except to say that if those arguments are not frivolous they border on it.

[it is] probative of . . . [Dr. Greer's] untruthfulness." Id. Scher's main argument is that the subsequent arrest would show that Dr. Greer was untruthful when he testified at the evidentiary hearing because the arrest is probative of his bias at the time. The theory, as we understand it, is that the district court could infer from the fact of Dr. Greer's arrest that he had slanted his report seven months earlier and his testimony three months earlier in favor of the State position's in order to curry favor in anticipation of a possible future arrest. The theory depends upon each of the following conjectures: first, that Dr. Greer had begun using drugs before the time he issued his report and gave his testimony in this case; second, that at the time he wrote the report and gave the testimony he anticipated getting caught; and, third, he thought that there was a reasonable possibility that having written a report and given testimony consistent with the State's position in an unrelated proceeding in the past would lead to more lenient treatment for him after his anticipated arrest. That conjectural chain is sufficiently unlikely that any finding based upon it would be clearly erroneous. For that reason, no remand is necessary.

In a recent case we approved the Florida Supreme Court's conclusion that evidence of government witnesses' collateral criminal conduct occurring at the time of their testimony is inadmissible to show that the witnesses had slanted their testimony in order to curry favor with the state. Breedlove v. Moore, 279 F.3d 952

(11th Cir. 2002).  The Florida Supreme Court had considered the bias argument, but rejected it "[b]ecause the detectives' criminal conduct was completely unrelated to the charges against Breedlove and because the detectives had not been indicted or convicted of any crime at the time of Breedlove's trial . . ." Breedlove, 279 F.3d at 963 (quoting Breedlove v. State, 580 So. 2d 605, 609 (Fla. 1991)). Because inquiry into the witnesses' criminal conduct would have done nothing more  than "'raise the possibility that [the detectives] had engaged in bad acts," it was not permitted. Id. (quoting Breedlove v. State, 580 So. 2d at 609).  Similarly, in this case, because  Dr. Greer's arrest is unrelated to the issue of Sanchez-Velasco's competency, and for the additional reason that it had not occurred at the time of his report and testimony, evidence of it  would be inadmissible.

There were no procedural flaws in the appointment of Dr. Greer, in his examination and report, or in his testimony at the hearing, and there is no reason to do any of it over.  Nor are there any flaws in any other aspect of the proceeding that are adverse to Scher's side of the case.   Scher  had the opportunity to question Dr. Greer, and he also had the opportunity to present new evidence challenging Sanchez-Velasco's competency, but he failed to do so.

The district court conducted  an extended colloquy with Sanchez-Velasco to determine whether he was mentally competent and truly wished to waive his rights

to federal habeas review. During that colloquy, the court asked Sanchez-Velasco why he had moved to dismiss the petition, and whether he understood that doing so meant he likely would be executed. The court asked whether Sanchez-Velasco wanted to pursue habeas relief, but not with Scher and CCRC as his lawyers. It reminded him that in the state proceedings he had changed his mind about waiving his post-conviction rights, and asked whether he was confident that he would not change his mind about this waiver request. To all of these questions, Sanchez-Velasco answered in a way that indicated he knew what he was doing and truly wished to do it.

Finally, the district court's finding that Sanchez-Velasco was competent was not clearly erroneous. The court had before it an unbroken string of state court determinations that Sanchez-Velasco was competent: at the time of the crime, immediately before trial, during trial, and at the time he sought to waive his Rule 3.850 petition. It had before it an overwhelming majority of mental health professionals who had determined Sanchez-Velasco was competent at various times while his state court proceedings were pending. It had before it Dr. Greer's fresh report and expert testimony at the hearing to the same effect. The court had no evidence before it to indicate that Sanchez-Velasco was not competent, other than evidence that had already been presented to and considered by the state courts.

Finally, the court had the evidence of Sanchez-Velasco's answers to the court's questions during the colloquy. In light of all of this evidence, the district court's finding that Sanchez-Velasco was mentally competent was not even close to erroneous, much less clearly erroneous.

## III. CONCLUSION

Scher has failed to convince us that the district court should not have granted Sanchez-Velasco's motion to dismiss the federal habeas petition filed in his name without his consent. On its way to dismissing the petition, the district court made some errors but all of them wrongly favored Scher. Scher has failed to satisfy either of the two Whitmore requirements for next-friend standing. He has not shown that he is truly dedicated to the best interests of the real party in interest, nor has he shown an adequate explanation for why the real party cannot appear in his own behalf. In light of the state court proceedings and his failure to proffer sufficient evidence to warrant another inquiry in federal court, Scher was not entitled to a re-determination of the mental competency question in federal court, but he got one. And the one he received was not tainted by procedural or other errors, nor is the finding the district court reached clearly erroneous.

That concludes our technical analysis or explanation in legal terms of why we are affirming the district  court's decision to grant Sanchez-Velasco's motion to

dismiss the federal habeas petition that had been filed in his name. But we should not forget the values that motivated the Supreme Court's <u>Whitmore</u> decision and what is really at stake in these kind of cases. These cases are about the right of self-determination and freedom to make fundamental choices affecting one's life. As a death row inmate, Sanchez-Velasco does not have many choices left. One choice the law does give him is whether to fight the death sentence he is under or accede to it. Sanchez-Velasco, who is mentally competent to make that choice, has decided not to contest his death sentence any further. He has the right to make that choice. Todd Scher and CCRC are strangers to Sanchez-Velasco. He has never asked them to represent him or consented to have them do so. He has directed them to leave his case alone, and the law will enforce that directive.

AFFIRMED.