**UNITED STATES ex rel. BRYANT v. HOUSTON, Secretary of the Treasury, et al.**

(Circuit Court of Appeals, Second Circuit. May 18, 1921.)

No. 260.

1. **Habeas corpus ⬦⇒54—Complaint by next friend not warranted without explanation.**

Under Rev. St. § 754 (Comp. St. § 1282), providing that application for writ of habeas corpus shall be made by complaint, "signed by the person for whose relief it is intended," and verified by the oath of the person making the application, a complaint made by one as "next friend" must set forth some reason or explanation, satisfactory to the court, showing why it is not signed and verified by the person detained, and what relation the next friend bears to such person.

2. **War ⬦⇒4—Order of president, retransferring the Coast Guard to the Treasury Department, valid.**

The order of the President of August 28, 1919, retransfering the Coast Guard from the Navy to the Treasury Department, made under Overman Act May 20, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 283a), *held* within the authority given by such act and effective.

Appeal from the District Court of the United States for the Southern District of New York.

Petition of Mildred Bryant, on behalf of Harry Harris, against D. F. Houston, Secretary of the Treasury, and others, for writ of habeas corpus. Writ denied, and petitioner appeals. Affirmed.

Emery C. Weller, for appellant.

Francis G. Caffey, U. S. Atty. (Earl B. Barnes, Asst. U. S. Atty., of counsel), for appellees.

Before WARD and ROGERS, Circuit Judges, and MAYER, District Judge.

MAYER, District Judge. [1] 1. This is an appeal from an order of the District Court for the Southern District of New York, dismissing a writ of habeas corpus. The writ was allowed on the application of "your petitioner, Mildred Bryant (a friend of Harry Harris), of Woodhaven, Long Island." The petitioner fails to disclose anywhere in her petition who she is, or what relationship, if any, she bears to Harry Harris, or whether Harry Harris for any reason was unable to sign and verify the petition, or whether the father of Harris, who according to the petition resides at No. 2128 North Twenty-First street, in Philadelphia, Pa., or Harry Harris himself, desired this application to be made. The petitioner, it is true, alleges that she is advised that

---

⬦⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Harris is "troubled with aphasia"; but this allegation is set forth as an excuse for his desertion, and not as explaining why Harris did not sign and verify the petition or complaint (as it should more aptly be called), in accordance with U. S. Compiled Statutes, § 1282 (R. S. § 754), which reads as follows:

"Sec. 1282. *Application for*—Application for writ of habeas corpus shall be made to the court, or justice, or judge authorized to issue the same, by complaint in writing, signed by the person for whose relief it is intended, setting forth the facts concerning the detention of the party restrained, in whose custody he is detained, and by virtue of what claim or authority, if known. The facts set forth in the complaint shall be verified by the oath of the person making the application."

The provisions of the section quoted, supra, indicate that it was not intended that a writ of habeas corpus should be allowed on the application of any person whomsoever without explanation as to why the complaint was not signed "by the person for whose relief" the writ "is intended."

The practice of a next friend applying for a writ is ancient and fully accepted. There are many instances and circumstances under which it may not be feasible nor possible that the detained person shall sign and verify the complaint. Inability to understand the English language or the situation, particularly in the case of aliens, impossibility of access to the person, or mental incapacity are all illustrations of a proper use of the "next friend" application. In re Ferrens, Fed. Cas. No. 4,746, Judge Blatchford, entertained an application made by the wife of an enlisted soldier and briefly summed up the practice as follows:

"It is claimed on the part of the United States that the writ must be dismissed, because it is not prosecuted by the recruit himself; that no one can prosecute it but himself, unless it be shown that he is debarred the opportunity of preferring a petition himself; and that such fact is not shown in this case. It has never been understood that, at common law, authority from a person unlawfully imprisoned or deprived of his liberty was necessary to warrant the issuing of a habeas corpus, to inquire into the cause of his detention. In the case of People v. Mercein, 3 Hill, 399, 407, the Supreme Court of New York intimate that such authority from the person detained is not ordinarily necessary. In case of Ashby, 14 How. St. Tr. 814, the House of Lords, in England, in 1704, resolved 'that every Englishman, who is imprisoned by any authority whatsoever, has an undoubted right, by his agents or friends, to apply for and obtain a writ of habeas corpus, in order to procure his liberty by due course of law.' This resolution was assented to by the house of commons. Id. 826. In the present case, the petitioner states, in her petition, that she is the wife of the recruit, and is dependent upon him for support. This is, I think, sufficient to authorize her to prosecute the writ."

But the complaint must set forth some reason or explanation satisfactory to the court showing why the detained person does not sign and verify the complaint and who "the next friend" is. It was not intended that the writ of habeas corpus should be availed of, as matter of course, by intruders or uninvited meddlers, styling themselves next friends. Gusman v. Marrero, 180 U. S. 81, 21 Sup. Ct. 293, 45 L. Ed. 436.

The case at bar well illustrates the desirability of making clear that applications of this character should not be entertained. There is noth-

ing to show that either Harris or his father authorized or desired this application to be made, or that it is a matter of the slightest concern to either of them whether Harris shall be tried by a Navy court-martial or by a Coast Guard court-martial.

There is nothing in the record to show that the point here considered was called to the attention of the District Court, but the District Court would have been justified in disallowing or dismissing the writ for failure on the part of the petitioner to show why she, and not Harris, signed and verified the complaint, and for failure to show what relationship, if any, existed between Harris and herself, or what was her concern, if any, in the detention of Harris.

We are not to be understood as holding that an outsider may not make the application for a writ of habeas corpus, but the application must set forth facts, which will satisfy the court that the interest of the next friend is appropriate, and that there is good reason why the detained person does not himself sign and verify the complaint, as provided in section 1282, supra.

[2] 2. At the time when the writ was allowed, Harris, it is alleged, was under arrest confined in the brig at the Barge Office of the New York Division of the United States Coast Guard, awaiting trial by a General Coast Guard Court upon charges of desertion, and of violating lawful regulations issued by the Secretary of the Treasury.

In time of peace, the United States Coast Guard is under the jurisdiction of the Treasury Department; but, in time of war, it is subject to the orders of the Secretary of the Navy. The act of January 28, 1915 (38 Stat. L. 800, 2 Fed. Stat. Ann. [2d Ed.] p. 262, Comp. St. §§ 8459½a[1]), provides in part:

"The Coast Guard, which shall constitute a part of the military forces of the United States and which shall operate under the Treasury Department in time of peace and operate as a part of the Navy, subject to the orders of the Secretary of the Navy, in time of war or when the President shall so direct."

At the date of the entry of the United States into the war with the German Empire, the Coast Guard automatically passed under the control of the Navy Department and so remained until August 28, 1919, when the President signed an order turning it back to the Treasury Department, under whose direction since said date it has been operated and is now operated.

The order directing the trial of Harris on the charges preferred against him was signed by the Assistant Secretary of the Treasury on February 21, 1921, and it is to be presumed that the General Coast Guard Court was duly convened by the same authority pursuant to the provisions of the statute. Act May 26, 1906, 34 Stat. L. 200 (2 Fed. Stat. Ann. [2d Ed.] 304).

The President's order of August 28, 1919, was as follows:

"By virtue of the authority conferred by 'An act authorizing the President to coordinate or consolidate executive bureaus, agencies, and offices, and for other purposes, in the interest of economy and the more efficient concentration of the government,' approved May 20, 1918, I do hereby make and publish the following order:

"The important purposes for which the operation of the Coast Guard was temporarily transferred to the Navy under the Act approved January 28, 1915, entitled 'An act to create the Coast Guard by combining therein the existing Life Saving Service and Revenue Cutter Service,' having been accomplished, and, it being for the best interest of the government and for the efficient service of the Coast Guard in connection with the collection of the revenue that the Coast Guard be under the supervision of the Treasury Department, it is hereby directed that the Coast Guard shall on and after this date operate under the Treasury Department."

The act of May 20, 1918, known as the Overman Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, 283a, 283b, 283f), so far as here applicable reads as follows:

"That for the national security and defense, for the successful prosecution of the war, for the support and maintenance of the Army and Navy, for the better utilization of resources and industries, and for the more effective exercise and more efficient administration by the President of his powers as Commander in Chief of the land and naval forces the President is hereby authorized to make such redistribution of functions among executive agencies as he may deem necessary, including any functions, duties, and powers hitherto by law conferred upon any executive department, commission, bureau, agency, office, or officer, in such manner as in his judgment shall seem best fitted to carry out the purposes of this act, and to this end is authorized to make such regulations and to issue such orders as he may deem necessary, which regulations and orders shall be in writing and filed with the head of the department affected and constitute a public record; Provided, that this act shall remain in force during the continuance of the present war and for six months after the termination of the war by proclamation of the treaty of peace, or at such earlier time as the President may designate: Provided further, that the termination of this act shall not affect any act done or any right or obligation accruing or accrued pursuant to this act and during the time that this act is in force: Provided further, that the authority by this act granted shall be exercised only in matters relating to the conduct of the present war.

"Sec. 2. That in carrying out the purposes of this act the President is authorized to utilize, coordinate, or consolidate any executive or administrative commissions, bureaus, agencies, offices, or officers now existing by law, to transfer any duties or powers from one existing department, commission, bureau, agency, office, or officer to another, to transfer the personnel thereof or any part of it either by detail or assignment, together with the whole or any part of the records and public property belonging thereto. * * *

"Sec. 6. That all laws or parts of laws conflicting with the provisions of this act are to the extent of such conflict suspended while this act is in force.

"Upon the termination of this act all executive or administrative agencies, departments, commissions, bureaus, offices, or officers shall exercise the same functions, duties, and powers as heretofore or as hereafter by law may be provided, any authorization of the President under this act to the contrary notwithstanding."

A mere reading of the act shows that the President was clothed with the widest measure of discretion, so far as concerned "matters relating to the conduct of the present war." "Upon the termination" of this act means, of course, upon the termination of "the present war." When the "present" war shall have been terminated, then (but not until then) "all executive * * * agencies * * * shall exercise the same functions * * * as heretofore or hereafter may be provided, any authorization of the President under this act to the contrary notwithstanding."

The President, by his order of August 28, 1919, exercised his discretion in respect of subject-matter over which, by the act of May 20, 1918, he had full power and authority, and the discretion, so exercised, is not reviewable.

The order dismissing the writ is affirmed.